IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | |
|---|---|
| Lorrie Miner, ) | |
| ) | **ORDER GRANTING DEFENDANTS'** |
| Plaintiff, ) | **MOTION FOR JUDGMENT ON THE** |
| ) | **PLEADINGS AND DENYING** |
| vs. ) | **PLAINTIFF'S MOTION FOR** |
| ) | **SUMMARY JUDGMENT** |
| Standing Rock Sioux Tribe and ) | |
| Standing Rock Tribal Court, ) | |
| ) | Case No. 1:08-cv-105 |
| Defendants. ) | |

Before the Court are the Defendants' Motion for Judgment on the Pleadings filed on December 23, 2008, and the Plaintiff's Motion for Summary Judgment filed on January 2, 2009. See Docket Nos. 7 and 10. The Plaintiff filed a consolidated brief in opposition to the Defendants' motion and in support of the motion for summary judgment. See Docket Nos. 11 and 12. On January 14, 2009, the Defendants filed a consolidated reply brief. See Docket Nos. 17 and 18. The Court grants the Defendants' motion for judgment on the pleadings and denies the Plaintiff's motion for summary judgment.

I.  **BACKGROUND**

On September 26, 2001, the citizens of the Standing Rock Sioux Reservation voted to retain the plaintiff, Lorrie Miner, as the Chief Judge of the Standing Rock Sioux Tribal Court for a four-year term commencing on September 26, 2001. On April 22, 2002, Miner and then Tribal Council Chairman Charles W. Murphy entered into an employment contract, entitled "Standing Rock Sioux Tribe Employment Agreement," to memorialize the terms and scope of Miner's employment. The

employment contract provided the following provisions with respect to compensation and leave and term of employment:

> 3. COMPENSATION AND LEAVE. As consideration for the services to be performed under this Agreement, the Tribe shall pay the Chief Judge a rate of $50.00 per hour . . . . The Chief Judge shall be entitled to receive an annual cost of living increase as provided for other permanent full-time employees. In addition, the Chief Judge shall be allowed to accumulate four (4) hours annual leave and four (4) hours sick leave per pay period and compensation leave ("comp time") . . . . The Chief Judge shall also be allowed to participate in the Tribe's 401(k) retirement program and the Tribe's Health Insurance program.
>
> . . .
>
> 4. TERM. The Chief Judge was retained in the September 2001 general election and shall serve a four (4) year term, unless removed for cause as provided in the Code of Justice. The Chief Judge shall be subject to another referendum election at the regular tribal election in September, 2005. If the Chief Judge is again retained in office, the parties may renegotiate or extend this Agreement, as agreed upon by the parties. If the Chief Judge is not retained in Office, the Chief Judge shall continue to serve until a replacement is appointed by the Chairman's Office or the Tribal Council.
>
> 5. TERMINATION. The parties agree that the Chief Judge may only be removed from office, prior to September 2005, as set forth in Section 1-307 of the Code of Justice. If removed, this Contract will terminate on the date of removal. Additionally, the Chief Judge may terminate this Agreement, provided the Tribe is given thirty (30) days advance notice, in writing.

See Docket No. 11-2.

On September 28, 2005, the citizens of the Standing Rock Sioux Reservation again voted to retain Miner as the Chief Judge of the Standing Rock Sioux Tribal Court for a four-year term commencing on September 28, 2005.

In November 2005, Archie Fool Bear, a member of the Tribal Council, informed Miner that the Judicial Committee sought to renegotiate her employment contract. Miner requested that the

2

Judicial Committee set forth its position in writing. On December 22, 2005, Fool Bear sent a letter to Miner proposing significant alterations to the terms of the April 22, 2002, employment contract.

In a letter dated December 22, 2005, Miner rejected the proposal set forth by Fool Bear, stating:

> With this letter I am rejecting the Chief Judge Position Proposal submitted to me under letter of December 22, 2005.
>
> First, my current employment contract does not expire as stated in your 12/1/2005 memo. There is not an expiration date in the current employment agreement, to-wit: *"if the Chief Judge is again retained in office, the parties may renegotiate or extend this Agreement, as agreed upon by the parties."* There being no expiration date, the employment agreement continues as is.

See Docket No. 1 (emphasis in original). On January 9, 2006, Fool Bear sent Miner a letter in which he proposed a twenty percent reduction in Miner's compensation and the elimination of any cost of living increases. In a letter dated January 11, 2006, Miner rejected Fool Bear's proposal and restated her decision to continue working under the terms of the April 22, 2002, employment contract.

On February 7, 2006, the Chairman contacted Miner to schedule a March 3, 2006, meeting with the Tribal Council for the sole purpose of renegotiating her employment contract. Miner submitted a proposal to the Tribal Council in which she set forth her proposed revisions to the employment contract. On February 27, 2006, the Judicial Committee passed a motion which recommended to the Tribal Council that Chief Judge Miner's yearly salary be reduced from over $91,000, plus paid leave and benefits, to $75,000 which would include all fringe benefits.

On March 3, 2006, the Tribal Council approved motions 10 and 13 which stated:

> #10. Motion was made by Joe White Mountain, seconded by Archie Fool Bear, to approve the Tribal Council has met with Judge Miner in an effort to negotiate a contract the Tribe's final offer has been rejected therefore it is moved that the Tribal Council now declares that the negotiations with the

3

> judges are concluded and there are no contracts existing between the said judge and the tribe.
>
> #13. Motion was made by Archie Fool Bear, seconded by Joe White Mountain, to approve that individuals performing professional services for the Tribe who do no have an authorized contract be given two [2] weeks notice that they will not be paid for their services after March 17, 2006, further that the tribal finance director is directed to insure that such individuals receive pay for work performed and for leave accrued and to be paid in full for those amounts on or before the close of business on March 17, 2006.

See Docket No. 11-3 (errors in original). Motion 10 was approved by Council Members Joe White Mountain, Sr., Frank White Bull, Archie Fool Bear, Matt Lopez, Henry Harrison, Milton Brown Otter, Joe Strong Heart, Sr., and Avis Little Eagle. Motion 13 was approved by Joe White Mountain, Sr., Frank White Bull, Milton Brown Otter, Joe Strong Heart, Sr., Archie Fool Bear, and Matt Lopez.

On March 3, 2006, Tribal Chairman Ron His Horse Is Thunder had a memo delivered to Miner which stated:

> The purpose of this memorandum is to advise ***all professionals performing services for the tribe, without a contract*** that the Tribal Council went on record today, March 3, 2006, to give two weeks notice to all individuals performing professional services for the Tribe who do not have an authorized contract that they will not be paid for their services after March 17, 2006. Further, by this motion the Tribal Finance Director has been directed to ensure that individuals affected by this Council action will receive pay for work performed and for leave accrued and in full for those amounts on or before the close of business March 17, 2006.

See Docket No. 11-4 (emphasis in original). On March 17, 2006, Miner surrendered her keys and Tribal identification.

On April 3, 2006, Miner filed a complaint in the Standing Rock Sioux Tribal Court against Ron His Horse Is Thunder, Archie Fool Bear, Joe White Mountain, Sr., Frank White Bull, Matt Lopez, Henry Harrison, Milton Brown Otter, Joe Strong Heart, Sr., and Avis Little Eagle, in their

4

individual capacities, alleging wrongful discharge, wrongful interference with contractual relations, breach of contract, gender discrimination, and civil conspiracy. See Docket No. 11-5. The defendants were the Tribal Council members who voted in favor of removing Miner from office and the Tribal Council Chairman, Ron His Horse Is Thunder.

A retired North Dakota state district court judge, Judge William F. Hodny, was specially appointed to preside over Miner's tribal lawsuit against the Tribal Council members. Fearing the appearance of impropriety, Tribal Judges Isaac Dog Eagle, Richard Frederick, and William P. Zuger recused themselves from hearing Miner's claims. Tribal Judge Zuger contacted Chief Justice Gerald W. VandeWalle of the North Dakota Supreme Court to recommend a retired judge to preside over Miner's tribal lawsuit. The Chief Justice recommended Judge Hodny for his impartiality and competence, and the North Dakota Supreme Court approved Judge Hodny for appointment as a Special Tribal Judge in the matter.[1] The Tribe appointed and ratified Judge Hodny to serve as a tribal judge in Miner's lawsuit pursuant to Section 1-302 of the Standing Rock Sioux Tribe Code of Justice. Section 1-302 provides:

> Each Justice and Judge shall initially be appointed by a two-thirds vote of the Tribal Council taken by roll call at a meeting at which a quorum is present . . . . Should a vacancy in a judgeship occur between sessions of the Tribal Council, the Chairman of the Tribal Council may fill the vacancy, subject to confirmation by a two-thirds vote of the Tribal Council taken by roll call vote at the next meeting of the Tribal Council at which a quorum is present.

---

[1] The North Dakota Supreme Court maintains a group of retired judges to act as surrogate judges in North Dakota district and appellate cases. Sec. Nat'l Bank, Edgeley v. Wald, 536 N.W.2d 924, 930 (N.D. 1995) (Sandstrom, J. , concurring) (citing N.D. Const. art. 6, §11). Canon 4(F) of the North Dakota Code of Judicial Conduct prevents a judge from performing judicial functions in a private capacity. However, the commentary to Canon 4(F) provides that service as a tribal judge by a surrogate judge, with the approval of the North Dakota Supreme Court, does not constitute performance of a judicial function in a private capacity.

Judge Hodny dismissed Miner's complaint on procedural grounds because the complaint was not verified. Miner reinstated her lawsuit by filing a verified complaint on September 6, 2006. Shortly after filing a verified complaint, Miner also filed a pretrial request for disqualification of Judge Hodny:

> Since Judge Hodny was appointed by defendant Ron His Horse Is Thunder, it is reasonable to question Judge Hodny's personal bias and prejudice in favor of defendant Ron His Horse Is Thunder. Judge Hodny presiding over this matter generates the very appearance of impropriety sought to be averted by Section 1-308.

See Docket Nos. 11-7 and 11-8. Judge Hodny agreed to recuse himself but noted he had no acquaintance with Tribal Council Chairman Ron His Horse Is Thunder, had never met or spoken to him, no tribal member had attempted to contact Judge Hodny, and his only contact with the Tribal Court was by telephone with the Court Administrator. Judge Hodny questioned whether Miner was "judge shopping." See Docket No. 11-7. Tribal Judge Zuger then presided over the case.

On October 3, 2006, the Tribal Court issued an "Administrative Order for Dismissal" in which it dismissed Miner's verified complaint with prejudice on the grounds that none of the tribal judges could hear the case on the merits without the appearance of impropriety because they were appointed by the named defendants. The Tribal Court instructed Miner to request that the Standing Rock Supreme Court hear the case in the first instance because each of the Supreme Court justices predated the Tribal Council Chairman and the Tribal Council members.

On October 11, 2006, Miner requested that the Standing Rock Supreme Court hear her claims in the first instance against the individual members of the Tribal Council. On April 16, 2007, the Standing Rock Supreme Court affirmed the Tribal Court's Administrative Order for Dismissal. See Docket No. 11-8. The Standing Rock Supreme Court stated,

6

> Appellants have effectively disqualified any judge from hearing their case because the only manner in which a tribal judge can be appointed is by action of the Tribal Council, of which virtually all are litigants in this case – (See SRST Ordinance 1-302)[2] Appellants suggest that this court can or should appoint a special judge to hear the case.  Appellees vehemently oppose such action and point to tribal law which prohibits anyone except the Tribal Council from appointing judges – See SRST Constitution, Article XII which provides that "The Judges of both the Supreme Court and the Tribal Court shall initially be appointed by a two-thirds majority vote of the Tribal Council."  Tribal Ordinance 1-302 provides that "each Judge shall be appointed by a two-thirds vote of the Tribal Council taken by roll call at a meeting at which a quorum is present . . . ."  Appellees cite no tribal authority for this Court to select a judge or to order that a certain judge be appointed to hear the case.
>
> It is clear that appointment of judges can be made only by the Tribal Council.  Appellants' agree that Article XII and Section 1-302, the law of the Standing Rock Sioux Tribe provides no resolution to the present conundrum, and that there appears to be no authority for a judge to preside over these matters who has been appointed by an individual or entity other than the Tribal Council and/or the Tribal Chairman . . . .  Appellants suggest that this Court order the parties to jointly agree upon a particular individual to preside over these actions and that the selected individual be automatically approved by the Tribal Council.  Such request involves dialog and negotiations of the parties and is not a proper function of this Court.  This Court lacks any original jurisdiction.
>
> . . .
>
> Obviously our jurisdiction is limited to reviewing final orders of the trial court and does not include the authority to supervise the parties or to perform legislative and political functions of the Tribal Council or the Tribal Chairman.

See Docket No. 11-8.

On January 11, 2008, Miner filed another complaint in the Tribal Court against the Standing Rock Sioux Tribe, alleging that the Tribe wrongfully discharged her, breached the employment contract, discriminated against her on the basis of her gender, and violated the Indian Civil Rights Act (ICRA).  On April 21, 2008, the Tribal Court dismissed the verified complaint against the

---

[2] SRST Ordinance 1-302 is also known as Section 1-302 of the Standing Rock Sioux Tribe Code of Justice.

7

Standing Rock Sioux Tribe with prejudice. The Tribal Court dismissed Miner's claims of breach of contract and gender discrimination on the basis of tribal sovereign immunity. The Tribal Court found that the Tribe did not enjoy sovereign immunity from suit on Miner's wrongful discharge and ICRA claims, but ultimately dismissed the claims on the basis of res judicata. The Standing Rock Supreme Court affirmed the decision of the Tribal Court, stating "We find no legal reason for disturbing the latest order of the trial court. The appellant has had her day in court. She chose not to proceed before any tribal judge appointed by the Appellee or to present her arguments to the trial court at her initial appearance. Our decision would simply be a repetition of our decision rendered on April 16, 2007." See Docket No. 11-11.

Miner filed this declaratory judgment action in federal court on December 2, 2008, seeking a declaration that the Tribal Court has jurisdiction over her breach of contract claim, and that her breach of contract, wrongful discharge, and ICRA claims are not barred by the doctrine of res judicata. See Docket No. 1. On December 23, 2008, the Defendants filed a motion for judgment on the pleadings, contending that the Court lacks subject matter jurisdiction over the action. See Docket No. 7. On January 2, 2009, Miner filed a motion for summary judgment. See Docket No. 10.

## II. STANDARD OF REVIEW

Rule 12(c) of the Federal Rules of Civil Procedure establishes that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." "Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." Faibisch v. Univ. of Minn., 304 F.3d 797,

803 (8th Cir. 2002) (citing United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)).  When presented with a motion for judgment on the pleadings, a district court must "'accept as true all factual allegations set out in the complaint" and "construe the complaint in the light most favorable to the plaintiff[s], drawing all inferences in [their] favor.'" Ashley County, Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009) (quoting Wishnatsky v. Rovner, 433 F.3d 608, 610 (8th Cir. 2006)).  The standard for judgment on the pleadings is the same as that for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Ashley County, Ark., 552 F.3d at 665.  "When considering a motion for judgment on the pleadings (or a motion to dismiss under Fed. R. Civ. P. 12(b)(6)), the court generally must ignore materials outside the pleadings, but it may consider 'some materials that are part of the public record or do not contradict the complaint,' as well as materials that are 'necessarily embraced by the pleadings.'" Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999) (quoting Missouri ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir. 1999); Piper Jaffray Companies, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 967 F. Supp. 1148, 1152 (D. Minn. 1997)).

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(c).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  The moving party bears the ultimate burden of proof to establish that there are no genuine issues of

material fact, and that the movant is entitled to judgment as a matter of law.  <u>Carrington v. City of Des Moines, Iowa</u>, 481 F.3d 1046, 1050-51 (8th Cir. 2007).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

**III.    JURISDICTION**

Before the Court will consider the substantive issues raised by the parties, the Court must first determine whether it has jurisdiction over this action.  It is well-established that federal courts are courts of limited jurisdiction.  Unlike state courts, federal courts have no "inherent" or "general" subject matter jurisdiction.  Federal courts can only adjudicate those cases which the Constitution and Congress authorize them to adjudicate.  Those types of cases generally involve diversity of citizenship (28 U.S.C. § 1332) or a federal question (28 U.S.C. § 1331).  Diversity jurisdiction is not present because Indian tribes are neither foreign states, nor citizens of a state.  <u>Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians</u>, 317 F.3d 840, 847 (8th Cir. 2003) (citing <u>Cherokee Nation v. Georgia</u>, 5 Pet. 1, 16-18 (1831); <u>Standing Rock Sioux Indian Tribe v. Dorgan</u>, 505 F.2d 1135, 1140 (8th Cir. 1974)).  Federal question jurisdiction can exist under 28 U.S.C. § 1331 if Miner's complaint states a claim arising under federal law.

The Defendants contend that this Court lacks jurisdiction over the action pursuant to the United States Supreme Court's holding in <u>Santa Clara Pueblo v. Martinez</u>, 436 U.S. 49, 61 (1978). <u>Santa Clara Pueblo</u> is a landmark case defining the impact of Title I of the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301-1303, on tribal sovereignty.

"The ICRA was passed with the declared purpose 'to secur[e] for the American Indian the broad constitutional rights afforded to other Americans.'" United States v. Wadena, 152 F.3d 831, 843 (8th Cir. 1998) (quoting Santa Clara Pueblo, 436 U.S. at 61). The ICRA was passed as a result of Congressional concern in the 1960s that individual Native Americans lacked constitutional rights under their tribal governments. Wadena, 152 F.3d at 843. In 25 U.S.C. § 1302, Congress imposed "certain restrictions upon tribal governments similar, but not identical, to those contained in the Bill of Rights and the Fourteenth Amendment." Santa Clara Pueblo, 436 U.S. at 57. Section 1302 provides:

> No Indian tribe in exercising powers of self-government shall –
>
> (1) make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;
>
> (2) violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized;
>
> (3) subject any person for the same offense to be twice put in jeopardy;
>
> (4) compel any person in any criminal case to be a witness against himself;
>
> (5) take any private property for a public use without just compensation;
>
> (6) deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense;
>
> (7) require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of one year and a fine of $5,000, or both;

  (8)  deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;

  (9)  pass any bill of attainder or ex post facto law; or

  (10)  deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons.

25 U.S.C. § 1302.

  In Santa Clara Pueblo, the plaintiff was a female member of the Santa Clara Pueblo Indian tribe and resided on the reservation. The plaintiff married a non-member Indian. At the time of their marriage, the tribe had in effect an ordinance which denied membership to the children of a female member who married a non-member, but extended membership to the children of a male member who married a non-member. The plaintiff filed a lawsuit in federal district court on behalf of herself and others similarly situated. She sought declaratory and injunctive relief against the enforcement of the tribal ordinance, alleging violations of the ICRA. The district court determined that the ICRA authorized civil actions for declaratory and injunctive relief. Martinez v. Santa Clara Pueblo, 402 F. Supp. 5, 11 (D.N.M. 1975). Following a bench trial, the district court found for the tribe because membership rules were basic to the tribe's economic and cultural identity and such decisions should be made by the people of Santa Clara Pueblo, not federal courts. Id. at 18. The plaintiff appealed to the Tenth Circuit Court of Appeals. The Tenth Circuit found it had jurisdiction under the ICRA to hear the action, but determined that because the ordinance was based upon gender, the classification was presumptively invidious and was valid only if the tribe's interest was compelling. Martinez v. Santa Clara Pueblo, 540 F.2d 1039, 1042, 1047, 1048 (10th Cir. 1976). On appeal, the United States Supreme Court considered whether the ICRA authorizes actions for declaratory or injunctive relief against a tribe's officers.

"Two distinct and competing purposes are manifest in the provisions of the ICRA: In addition to its objective of strengthening the position of individual tribal members vis-a-vis the tribe, Congress also intended to promote the well-established federal 'policy of furthering Indian self-government.'" Santa Clara Pueblo v. Martinez, 436 U.S. 49, 62 (1978). By enacting the ICRA, Congress imposed quasi-Constitutional requirements on Indian tribes. But a violation of these rights is not necessarily reviewable in a federal court: "Creation of a federal cause of action for the enforcement of rights created in Title I [of the ICRA], however useful it might be in securing compliance with [25 U.S.C.] § 1302, plainly would be at odds with the congressional goal of protecting tribal self-government. Not only would it undermine the authority of tribal forums, but it would also impose serious financial burdens on already 'financially disadvantaged' tribes." Id. at 64 (citation omitted). The United States Supreme Court ultimately held that the ICRA provides no federal cause of action in federal cases, except for habeas corpus:

> Given [the legislative] history [of the ICRA], it is highly unlikely that Congress would have intended a private cause of action for injunctive and declaratory relief to be available in the federal courts to secure enforcement of § 1302. Although the only Committee Report on the ICRA in its final form, S.Rep. No. 841, 90th Cong., 1st Sess. (1967), sheds little additional light on this question, it would hardly support a contrary conclusion. Indeed its description of the purpose of Title I, as well as the floor debates on the bill, indicates that the ICRA was generally understood to authorize federal judicial review of tribal actions only through the habeas corpus provisions of [25 U.S.C.] § 1303.[3] These factors, together with Congress' rejection of proposals that clearly would have authorized causes of action other than habeas corpus, persuade us that Congress, aware of the intrusive effect of federal judicial review upon tribal self-government, intended to create only a limited mechanism for such review, namely, that provided for expressly in §1303.

Id. at 69-70.   The United States Supreme Court further said,

---

[3] 25 U.S.C. § 1303 provides, "The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe."

> As we have repeatedly emphasized, Congress' authority over Indian matters is extraordinarily broad, and the role of courts in adjusting relations between and among tribes and their members correspondingly restrained. Congress retains authority expressly to authorize civil actions for injunctive or other relief to redress violations of § 1302, in the event that the tribes themselves prove deficient in applying and enforcing its substantive provisions. But unless and until Congress makes clear its intention to permit the additional intrusion on tribal sovereignty that adjudication of such actions in a federal forum would represent, we are constrained to find that § 1302 does not impliedly authorize actions for declaratory or injunctive relief against either the tribe or its officers.

Id. at 72. Accordingly, the United States Supreme Court held that a federal court may not enforce the provisions of ICRA by means of declaratory or injunctive relief.

The Plaintiff in this action contends that Santa Clara Pueblo v. Martinez is distinguishable because "[u]nlike the plaintiff in Santa Clara, Ms. Miner is not asking the federal court to provide her with relief under ICRA – she is merely asking that she be allowed to **enforce her rights under ICRA in Tribal Court**." See Docket No. 11 (emphasis in original). The holding in Santa Clara Pueblo v. Martinez is controlling and precludes this Court from hearing Miner's claims.

In this action, Miner seeks declaratory relief under 28 U.S.C. § 2201 seeking a declaration that the Tribal Court has jurisdiction over her breach of contract, wrongful discharge, and ICRA claims. "Federal courts may entertain claims for declaratory relief under 28 U.S.C. § 2201, so long as they raise a federal question." Gaming World Int'l, 317 F.3d at 847. The Court finds that Miner has failed to raise a federal question and that the Court lacks subject matter jurisdiction over this dispute.

The Tribal Court considered the nature of Miner's claims in light of relevant case law. In a thorough and well-reasoned decision, the Tribal Court reviewed each of Miner's claims and dismissed the first complaint which was affirmed by the Standing Rock Supreme Court. A second complaint was then filed against the Standing Rock Sioux Tribe. The Tribal Court considered the

14

similarity of the two complaints that Miner had filed in Tribal Court and ultimately determined the second lawsuit was barred by res judicata. The Standing Rock Supreme Court then affirmed the Tribal Court's decision. The tribal courts clearly have jurisdiction over this dispute and are the appropriate forum to address all of the claims asserted.

## VI.    CONCLUSION

The Court finds that the Tribal Court had subject matter jurisdiction over the Plaintiff's claims against the individual members of the Tribal Council members and the Standing Rock Sioux Tribe. The Plaintiff requested the recusal of Judge Hodny on the grounds that he was appointed by defendant Tribal Council Chairman Ron His Horse Is Thunder which created the appearance of impropriety. The tribal courts determined that the Plaintiff effectively barred any judge from hearing her claims in Tribal Court when she requested the recusal of Judge Hodny because Section 1-302 of the Standing Rock Sioux Tribe Code of Justice requires any judge or justice to be appointed by the Tribal Council. The tribal courts held that any judge appointed to hear the Plaintiff's case would face the same alleged appearance of impropriety.

Proper deference to the tribal court system precludes relitigation of the issues raised and resolved in tribal court. The tribal courts considered the merits of the Plaintiff's claims. This Court must exercise restraint and will not disturb the ruling of the tribal courts. The Court remains mindful of the Supreme Court's admonition in Santa Clara Pueblo v. Martinez that in order to avoid unduly intruding on tribal self-government, enforcement of most of the guarantees of the Indian Civil Rights Act should be left to the tribal courts. 436 U.S. 49, 65-66. The United States Supreme Court expressly held that "[t]ribal courts have repeatedly been recognized as appropriate forums for the

exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." Id. The appropriate forum to resolve this dispute is within the tribal court system. Although the plaintiff has styled this action as a request for declaratory relief, the Court concludes that it lacks subject matter jurisdiction over the matter. For the reasons set forth above, the Defendants' Motion for Judgment on the Pleadings (Docket No. 7) is **GRANTED** and the Plaintiff's Motion for Summary Judgment (Docket No. 10) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 20th day of May, 2009.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court